Illinois Appellate Court, First District Court is now in session. The Sixth Division, Justice Mary Mick for presiding, case number 1-7-2627, People v. Edgardo Colon. Good afternoon, Counsel, and welcome to the Zoom argument for the First Appellate District. I'm not sure if either of you have done Zoom arguments with us before, but let me just briefly outline how we hope to proceed, which is to allow each side to talk for 10 minutes uninterrupted by us, just to sort of focus us on what you want us to focus on for the argument. And then we will question you one at a time, beginning with Justice Harris and Justice will have, can reserve up to five minutes for rebuttal if you want to, of that 10 minutes, you know, if you want to reserve part of it for rebuttal. Does that make sense to everybody? Yes. And before we begin, can each of you state your name for the record and tell us who you're representing? Good afternoon, Your Honors and Counsel. My name is Brett Zee from the Appellate Defender's Office and I represent Mr. Edgardo Colon. And Mr. Zee, would you like to reserve some of your 10 minutes for rebuttal? I'd like to reserve about one minute if I could. Thank you. Hello, I'm Assistant State's Attorney Iris Ferrosi for the People. All right. All right. And Mr. Zee, am I pronouncing that name right? Yes, you are, Your Honor. Thank you. Whenever you're ready. Thank you. May it please the court. Your Honors, the issue in this case is centered on the electronically recorded interrogation of Mr. Colon and the legal disputes in this case involve whether and when Mr. Colon invoked his right to counsel and the legal disputes involve whether the detectives who interrogated him honored that invocation and also whether Colon re-initiated discussion with the detectives prior to his confession on the ERI. There aren't any facts in dispute here. Everything is on the video. So this court's review of how the trial court applied the law to those facts is de novo. And in a nutshell, just to give a roadmap for the court, the video shows two experienced Chicago police detectives ignoring Mr. Colon's multiple requests for counsel and then leveraging multiple routine custodial interactions with Mr. Colon to its advantage to continue that interrogation until Mr. Colon ultimately admitted to being the driver in this case. The detectives actions, essentially ignoring Colon's request for counsel and then continuing to interrogate him until he finally confessed on the tape, violated Edwards v. Arizona. The first time Mr. Colon invoked his right to counsel was on January 5, 2012 at 9.59 p.m. when he told the detectives, quote, man, I'm starting to just say, fuck it, get me a lawyer because when Colon said this, he had been in police custody for more than 50 hours and he'd been interrogated by detectives Perez and Hillman regarding the murder of a fellow Chicago police officer who was working off duty as a security guard in the convenience store. The detectives completely ignored Colon's request for counsel, didn't allow Mr. Colon to even finish his sentence and then continued questioning him as if Mr. Colon had said nothing. Now looking at these circumstances objectively, Colon's statement can reasonably be construed as an expression of a desire for counsel. The detectives were required to stop interrogating him at that point until a lawyer was made available to Mr. Colon or until he re-initiated conversation with the trial court found and as the state argues, the parties do agree that Colon in fact invoked his right to counsel less than two hours later at 11.46 p.m. when Colon said to Detective Hillman, is there any way we can get like a public defender to come in? Now again, instead of ceasing the interrogation at that point, Detective Hillman just kept going, ignored the request and said, hold on, listen, relax, kick back, have a smoke, you want something to eat? And then moments later Detective Perez also came back into the interrogation room and he went right back into interrogating Mr. Colon. This is part of that exchange that occurred shortly after that invocation. This is at 11.47 on the ERI. This is Detective Perez. Would you just tell me this much so we can continue? I don't want to stop. I want to help you out. Are you going to help me out? You were driving that fucking car. You were driving, yes or no? And then at that point, Colon meekly says, yeah. That's the first point on this ERI where Colon affirmably says, I was the driver in this case. Now the trial court initially got this correct, finding that Colon did invoke his right to counsel at that point at 11.46, and the court initially excluded all of the statements Colon went on to make after that point. But after the court reconsidered its ruling at the state's urging, it changed its ruling and it found that Mr. Colon reinstated discussions with the detectives at 1.09 a.m. That's the point when Detective Perez read Mr. Colon's Miranda rights. And then the court allowed all of Colon's statements to come in after that point, after 1.09 a.m. But contrary to the trial court's finding, Colon never re-initiated further discussions with the detectives, and that's because the interrogation never stopped. I mean, experienced detectives used Colon's neutral requests, such as asking to see his girlfriend, asking for a garbage can to throw up, asking for a cigarette, to continue interrogating Colon until he eventually confessed to being the driver. Now the relevant test for whether Colon re-initiated discussions with the detectives after he did invoke his right to counsel is, number one, whether Colon, rather than Detectives Hillman and Perez, initiated discussion in a matter evincing a willingness and a desire for a generalized discussion about the investigation. And number two, if the answer to that question is yes, whether Colon knowingly and intelligently waived his right to counsel. Now there are three separate times I'd like to highlight, two of which the state argues are the points where Mr. Colon re-initiated discussions, and one is the point where the trial court found that he re-initiated the discussions. The first one is January 5, 2012 at 11.53 p.m. That's less than 10 minutes after he invoked his counsel, right to counsel, at 11.46. At that point, Mr. Colon knocked on the door of the interrogation room and asked to speak to his girlfriend. The detectives come in and tell him, your girlfriend's no longer here, she's home, she's no longer needed. Mr. Colon said he was scared of going to jail, and then the detective Perez just continued the interrogation at that point instead of stopping. Asking to see your girlfriend is just a routine part of being in custody. It's a routine part of the custodial relationship with the detectives. It's not evidence of a desire for a generalized discussion about the case. Mr. Colon also was not Mirandized at that point. The second point is less than an hour later, on January 6, 2012 at 12.42 a.m. At that point, again, Colon knocked on the door of the interrogation room, and this is where he asked Detective Perez for a garbage can because Mr. Colon was feeling sick. He had just eaten a hamburger that the detectives gave him after he confessed to being the driver. They gave him a hamburger and fries. Detective Perez comes into the room, puts a garbage can down, and then decides to take Mr. Colon to the restroom so he can throw up there. The video shows that four minutes later, they both come back into the room. Detective Perez gives Mr. Colon a cigarette, and then they go from there. Again, asking for a garbage can to throw up, that is not evidence of a desire for a generalized discussion about the investigation. That's just a neutral interaction, a neutral part of the custodial relationship. Finally, on January 6, 2012 at 1.08, 1.09 a.m., that's about 30 minutes later, Colon knocks on the door again, and this time he asks Detective Perez for a cigarette. Asking for a cigarette, again, that's routine. That is not an indication of a generalized desire for further discussion about the investigation. Detective Perez gives him the cigarette, asks Mr. Colon if he's feeling better, asks him what's wrong, and then immediately goes into making sure that Mr. Colon has understood his Miranda rights and reads them again. Notably, when Detective Perez tells Mr. Colon that he has the right to have an attorney present with him, Colon says, quote, yeah, that's what I was kind of, but again, the detective just interrupted him, didn't let him finish, and then went on with essentially going over the, making sure that Colon was ready then to give his statement to ASA Brasile a couple hours later when he comes into the room at 3.28 a.m. So again, knocking on the door and asking for a cigarette, that's routine. That's not an indication of a generalized desire to talk about the case further. And under Edwards, that's an error. The interrogation should have stopped. It shouldn't have kept going. And the state cannot establish a valid waiver of that right to counsel by showing only that Colon responded to detective-initiated questioning. And that's all that happened here, even if Colon had been advised of his Miranda rights as he was at 1.08 a.m. Mr. Z, if you have about one more minute of uninterrupted time. Okay. Thank you. I'll be quick. Finally, then, the error in admitting his statements was not harmless beyond a reasonable doubt. This confession was played to the jury. In closing argument, it was played. The prosecutor told the jury that Colon hung himself with this statement. It was by far the most damning testimony or the most damning evidence against Mr. Colon in this case. And the testimony from Mr. DeYoung, he did, in fact, tell the police and the grand jury that Mr. Colon was the driver. But then at trial, he testified that he had lied to the police and he lied at the grand jury and testified that he was with his family initially and then with his girlfriend at a hotel for the rest of the night and that he was not in the car with Colon and the co-defendants. So, in conclusion, the trial court heard and denied Colon's motion to suppress his statements. When Colon invoked his right to counsel, the detectives did not honor it. They ignored it. They continued to leverage these subsequent neutral interactions with Mr. Colon. Mr. Colon respectfully asked this court to reverse his convictions and remand for a new trial that are free from the statements that he made after 9.59 p.m. on January 5, 2012. Or alternatively, if the court finds that initial invocation to be ambiguous, then all of his statements after 11.46 p.m. should be excluded. And notably, Mr. Colon didn't make any further inculpatory statements between 9.59 p.m. and 11.46 p.m., so the relief is the same. Thank you. Justice Harris, do you have some questions for Mr. Zeke? Yes, yes, thank you. Counsel, you didn't speak very much about the conversation that took place at 9.50 or 9.54. At that time, he said, man, I'm just starting to just, and then fuck it, get me a non-equivocal request for counsel at that time. Yes, and that's our position, that it is indeed an affirmative request for counsel. And I argued that extensively in my brief that was a clear invocation of counsel. It wasn't a request for an attorney sometime in the distant future. It was one that he wanted right now. He had been in custody for more than 50 hours in a very serious murder case of a police officer with detectives who understandably wanted to figure out who did it and to get a confession. The trial court, on further motion and hearing, she suggested or characterized definitely that what he said was, maybe I should get a lawyer. That is correct. In other words, maybe were her authorization that that would took place. That's correct. The trial court characterized it as, I think what was happening is that, I'm not positive that the court just, I don't think it was intentionally misrepresenting the record. I think the way the trial court viewed Mr. Cullum's statement to the detectives was trying to classify it more as a maybe and therefore more ambiguous. But you're correct that he never used the word maybe. Thank you. Thank you, Your Honor. Justice Connors. Thank you. Mr. Z, you suggest in your brief that Mr. Cologne should have been asked to clarify his words, is that right? Or would have been interesting or nice or whatever? Ideally, yes. The law doesn't specifically, as you're aware, doesn't specifically require the detective to inquire further. If in fact, objectively, the detective thinks that that's an ambiguous statement. Our position would be under these circumstances with these experienced detectives in this very serious case, they knew what Mr. Cologne was asking and the detectives chose to ignore it and chose to keep interrogating him instead of stopping the questioning and getting the lawyer for Mr. Cologne. Yeah. As you are aware, our Supreme Court has said that would have been good practice, but it's not a prerequisite. Is that right? That's true. But one easy question would have eliminated all confusion at that point. Yes. Counselor, do you want to comment about the conduct of the attorney or excuse me, the detective and the reasonableness of it when every time the mention of a lawyer came up from the defendant that the officer would or detective would change the subject? Was that a pattern of some kind? It certainly seemed like a pattern. Yes. Just watching the length of the video, that's the pattern is that on the occasion where Mr. Cologne said the word lawyer or public defender, it was like he didn't say anything and the detectives just ignored it and went down a different path, either asked him if he was OK or just kept with the interrogation, which was the modus operandi here. Instead of acknowledging that Mr. Cologne asked for an attorney and stopping things at that point like they should pursuant to Edwards, they kept going. And then again, whenever Mr. Cologne would knock on the door for neutral things like asking for a cigarette, asking for a garbage can, asking to see his girl, they leveraged that situation then to quickly deal with that little thing and then go right back into the interrogation. And that's why our position is this interrogation never stopped. There was never an honoring of that invocation of right to counsel. Counsel, and remind me if my recollection is correct, but at the nine forty five portion that Justice Harris was just talking about, he did talk about I'm fitting. I'm he didn't say fitting, but he said I am thinking about what's the exact word there? He says I'm starting to say fuck it. Just get me started. That was it. Thank you. I'm starting. And then there was some comedy made about the state's attorney. Is that right? Well, there's there's a discussion about the state's attorney throughout the entirety of the interrogation, and it's definitely a game of Mr. Cologne asking for an attorney being ignored and then trying to to leverage his position as well to try to to to get some sort of deal before he incriminates himself on the tape. But, you know, there's asking for your right to counsel, being ignored and then also at the same time trying to get a deal. Those things that doesn't negate Edwards, that doesn't negate his invocation. Again, the question is, did he reinitiate discussion? And at all three of these points, it was the detectives who reinitiated. And it was Mr. Cologne asking for neutral things, the garbage can, the cigarette to see his girlfriend. Thank you, counsel. Thank you. Council was the entire E.R.I. before the trial court. Well, as far as the motion to suppress, there were only portions of that of the correct me if I'm right. But at the motion, the way I read the record was at the motion to suppress. There was portions of the entire E.R.I. that were turned into smaller clips that were then played. And so initially that's what I had. I had seen all that. I didn't have the entire E.R.I. So thank you for allowing me to pick up the evidence and then look at it. There's there was no surprises. And the rest of the E.R.I., I think everything that was necessary is in those clips. Certainly watching the entire E.R.I. from the moment that it's turned on to the moment where everything has happened and he's given a statement to the A.S.A. is more powerful as far as getting a flavor for what actually happened in this interaction. But do you know whether the trial court had the whole E.R.I. if at some point it was given to the trial court judge? Do you know? There's no indication that the judge didn't. Didn't have it. We just don't know. It's in the record and we don't. OK. And is there any transcript of the E.R.I.? I know there there are there's of the clips. There's some transcript. But how about of the E.R.I. itself? Is there a transcript that you're aware that you've seen? Unfortunately, I'm not aware of a verbatim transcript of the entire E.R.I. from when it was turned on to when it was turned off. OK. And then you said an argument that between the first fuck it, man, I'm just trying to say fuck it between that what you call an invocation and the second invocation that the trial court said was an indication that Mr. didn't make any damaging statements. But I thought that at 10.03 p.m., Mr. Cologne and Sergeant Perez had a conversation that, in fact, did contain an incriminating statement so that there really is a difference in terms of when we would find there was an invocation. Am I wrong? Well, I should I should clarify that what I mean is there wasn't anything additional to what Detective Perez claimed that Mr. Cologne had told him before the E.R.I. was activated. So before it was activated, Detective Perez testified at the suppression hearing that after essentially more than 50 hours of questioning and being treated as an alleged third party witness that Mr. Cologne finally admitted to being the driver. So that's the incriminating evidence that prompted the E.R.I. to be activated. But the point where we're arguing and we're strongly arguing that he did, in fact, invoke his right to counsel at 9.59, where he said, I'm starting to say, fuck it, get me a lawyer because. So I want to be clear on that, that there's it doesn't say anything beyond what he says between those points is that I was lying before about being the driver. So he says that, no, I was scared. I want to get out of here. I'm a compulsive liar, a whole host of things. But between the invocation at 9.59 and then at 11.46, he never affirmatively says I was the driver. Here's where we drove. Here's why I stopped in the alley. Here's who got in the car. Here's where they were sitting. This is what happened when they went via and got out of the car. So all those things happen after the second invocation. But you are correct that he does say something that is incriminating by saying he lied before about being the driver. OK, I'm. I'm going to ask you to check that and let the court and counsel know if when you check the record that that seems right, because that's not resonating with my understanding. I thought that at 10.03 he makes an incriminating statement, but I will check the record as well. And I'm going to ask you to do the same and just because obviously the harmless error argument that the state makes is going to be could be different if in fact there's an incriminating statement made between those two potential invocations, correct? That's correct, Your Honor. OK, I'm going to be looking through my notes here in the meantime. All right. Well, you should listen to Mr. Rossi. So you can you can send a letter to the court in the next couple of days and just let us know that you've checked the record and what you find. All right. I believe that we will turn to Mr. Rossi. Good afternoon, Your Honors. May it please the court. My name is Assistant State's Attorney Iris Rossi. Before I jump into my argument, Justice McFarland, I do have the time that right before defendant was brought into the room with the camera where he admitted to being the of the detective, that up until that point, the defendant had been just possibly a witness. He hadn't incriminated himself, but he was talking to the detectives, began to cry, asked to see his girlfriend and stated he knew he was going to jail for life because he was the driver and drove Clay and Villa to the store to rob it. And that's when decided to move him into the room with the recording equipment. That being said, I will return to the harmless error argument, but I would like to point out a few things and respond to counsel's argument. The first one being that whether defendant invoked his right to counsel when he said, I'm starting to say, fuck it, get me a lawyer is is should be viewed in what a what police officer, how a reasonable police officer would have interpreted that. It's not to be viewed as to what defendant meant by it or what anyone else believed he meant. It was what a reasonable police officer would believe. And that is not just based on looking piecemealing and taking certain statements out of his out of his entire statement, but it's looking at the context of what the and obviously whether he had been read Miranda. I don't think there's a dispute that he had been read as Miranda rights and that his the council has not challenged the voluntariness of his statement or that whether he gave it knowingly or intelligently, it's really just did he invoke that is based on what the police officer believes and he is not required to ask for clarification. Um, it is an investigation, a murder investigation of a Chicago police officer. Um, and his starting to say, fuck it, get me a lawyer can be viewed by a police officer as being, um, something in the future that I'm beginning to think that, um, that's not different, very different from the cases I cited in my brief where, um, the courts have ruled that it was a equivocal request for people versus Oaks. Maybe I should talk to a lawyer as Davis, and I should probably get a lawyer. I might be needing one, which is the case of Tackett. All three of those were, um, determined to be equivocal requests for counsel. If you look at the context of when the defendant is saying that, um, that he is starting to say, fuck it, get me a lawyer. It is because he's already made a statement to the police. The police move him into a room with a recording device. And if you view the video, um, he's very unhappy about being in a room with a camera. Um, he is read as Miranda writes again, and notably the detective, um, tells him two times about his right to counsel. Um, so he asked him if he understands his rights and then reiterates that he has a right to counsel and defendant falls right into he, that he wants these guarantees. He wants a guarantee that the, that the ASA, um, who's at the area that he had already met is going to give him some type of leniency. And that is the conversation. So when, when you look at just the words, you have to look at the conduct as well in the video is what I'm immediately interrupting him and, Oh no, no, no. Let's not talk about lawyers. It's okay. I will talk to the ASA. The defendant's getting very frustrated and he's very concerned about the video that's going on. That's reasonable for a police officer in that situation, that this is an ambiguous request. And it's really just a conversation about trying to achieve some type of leniency from the ASA. Keep in mind, this defendant has been trying to get leniency from the moment he was arrested, um, on a gun charge by putting himself into the equation by telling the police at that time that he had information on officer Lewis's death. And that was to get leniency from his gun case. So when that didn't work, um, he, he was working on getting leniency from the ASA. Um, and also keep in mind, he'd also gone to, um, the, um, lie detector, which he, um, requested as well. So he is trying to get himself out. Um, if you look at that and the fact of what the officers knew at the time, and that also factors into reasonableness, the officers knew that, um, he had some type of a criminal background. So it was reasonable for them to know, to equate that he understands his right to counsel. And there's no reason for him not to just say, I want a lawyer here. Now, there's no reason for him to not be, have the ability to say that at any point in time, which he didn't. Um, I also take issue with counsel's characterization of the defendant's re-initiation with the court found to be his re-initiation. He didn't just say, I want to speak to my girlfriend. He said, I want to speak to my girlfriend. And when the detectives told him she's not here, he, suespante says, oh, it talks about his fear of going into prison because these guys are going to kill him because they're going to find out that he confessed. That was the re-initiation. He is showing his desire to continuously talk about, um, his case. So while counsel characterizes this as the police keep talking to him, that's because the defendant keeps knocking on the door wanting to talk. So that's why the police keep talking to him because he keeps expressing this desire to talk about his case. So, um, it is our position that he did re-initiate. We agree with the, um, the court that he did and that after he re-initiated, um, he was read his rights. He, um, not, not immediately, but he was read his rights again by the detective and the detective said to him, I'm doing this to make sure you understand. I want to be a hundred percent sure you understand your rights. Do you understand that? Defendant's response was a hundred percent, meaning he understands his rights and at that point does not say, I don't want to talk anymore. Um, the detective leaves the room and approximately two and a half hours later, the, um, ASA, John Brazel comes into the room. He's read his rights again by, uh, John Brazel. He does not invoke and he, um, makes a statement implicating himself in the murder of officer Lewis. So it's our position that, um, the first invocation was equivocal in nature. Um, the court ruled that the second invocation was unequivocal, but the defendant re-initiated and kept wanting to talk to the police. And it's very important that this court notes that he didn't just say, where's my girlfriend. He said, where's my girlfriend? And when the police responded to his question, he started talking about his case, indicating a desire to continue discussing his case. Um, also the fact that counsel says, keeps repeating that defendant was in custody for over 50 hours, that that's defendant's partially his own doing because he's arrested on the gun case. Um, he implicates himself at some point into this case, tried to get leniency, asked for a polygraph. These are all things the defendant is, um, asking for, which is increasing his time in custody. Um, he really wasn't, the police didn't question him, um, about this murder until, um, the, uh, 5th, January 5th, 2012 at around 2154 hours. So all the, everything before that was him and his gun case. So the 50 hours, I don't think this court should, um, factor that into that. I mean, that would factor into, I guess, unreasonable or involuntariness, which defendant is not alleging that this was involuntary. So, um, one minute, I could just have one moment. I believe your honor. Um, I think it was a justice Connors asked about whether the court had the ERI, the entire ERI. Um, according to the record page three Oh six. Um, it is an indication that the, uh, the court did have the entirety of the ERI when she made, um, the, um, ruling. So I wanted to circle back to that. And now to the harmless error we have as even if this court were to find error in the court's ruling that the first, um, invocation was unequivocal. Um, it would, there would be harmless. The, the case did not just hinge on defendant's statement. There was also Melvin DeYoung, um, whose grand jury transcript was admitted into, uh, trial, um, in front of the jury as substantive evidence of a statement he had made a prior and consistent statement. So that is substantive evidence wherein he, um, implicated the defendant as along with defendants and Villa, um, as being participants in the murder of, um, officer Lewis, not about one more minute of uninterrupted time. Um, we have that plus the statements he made to John Dillon, ASA John Dillon before he went into the grand jury. Um, he, he also pointed out to the video evidence that was presented and was able to pick out that which defendants went into, uh, the M and M convenience store. Um, we have that and we have all the statements he made before he, before he became, um, before he was moved into that room, uh, with the video equipment where he implicated himself. So that initial, um, oral, um, confession would still come into trial. So we would argue that the error would be harmless. If this court does find that, um, first statement about a lawyer wasn't on a biblical request for counsel. Thank you. Thank you. Justice Harris. Thank you. Console. Is this an affirmative or unaffirmative statement? Get me a lawyer, man, because I need a guarantee. Is that affirmative? Um, well, that's not what happened here, your honor. Um, he said, let's say, let's say it did. Is that an affirmative statement? It would depend on the totality of the circumstances and what had been said prior to that statement. If I said to you, get me a glass of water because I'm thirsty. Is that affirmative or unaffirmative? I would say that's affirmative. The person says, get me a lawyer because I need a guarantee. Is that equivocal or unequivocal? Well, I would argue that would possibly still be unequivocal because the guarantee is from the ASA. So that is something happening in the future when he speaks to the ASA, it's not, it's conditioned precedent. So that I would argue that's not what happened here, but I would argue that that might, a reasonable officer might find that that is not a unequivocal request. Why is it conditioned in the future? In your mind, the standard is what the officer determines is reasonable? That is the standard. It's a question of laws, not that when we're presented with this argument today, it becomes an argument as to the law. Yes. It's a, it's a factual determination, but it's a, it's a two-part for a motion to suppress statements. Whether or not it's factually correct or not, we enter into a discussion as to what is reasonable to the officer. That's right. And what the defendants, wouldn't it be reasonable for an attorney to say, I'm just starting to just get me a lawyer, man, because I need a guarantee. Now, if the officer listening to that, would he be unreasonable or reasonable in deciding whether or not this man affirmatively is requesting an attorney? Your Honor, I believe when he's saying, I'm starting to say, and I want to guarantee from the ASA that the, that the reasonable police officer couldn't believe that interpret that to be an unequivocal, or I'm sorry, an equivocal request. Cause it's based on something in the future, not based on what was happening at that moment. And he was trying to garner leniency with the ASA. If you look at the entire conversation that was occurring. Thank you. Justice, are you done justice Harris? Yes. Yes, I am. Thank you. Justice Connors. Counsel, as far as the reasonable officer standard, is there a case that you can cite that can give me the criteria for that? Um, recently, I believe that's Davis. Uh, um, Davis is a U S Supreme court. And what's the standard? What's the criteria? I'm sorry. One moment, please. Um, I'm sorry. That was also doubted by in rate Christopher K by our Supreme court. Um, blank there for a second. So, um, that would be what would a reasonable officer in light of the circumstances have understood the words from the defendant to me. Right. There's no other criteria other than that sentence in regard to the totality of the circumstances. What would the officer think that's it for the criteria, right? Yes. Yeah. Okay. Um, let me ask you this. I think you make an argument that, um, the defendant was trying to get a reaction out of the police officer with the first one that happened around nine 49, nine 50, whatever that exact time is. And I always seem to get wrong. Uh, when he said, I'm starting to say bucket and get a lawyer, um, that he was somehow so clever to say he wanted to get a reaction of the officer to get some, something out of the officer. Uh, is that part of your argument that I'm trying to get something from the officer for making this well, not me. I mean, garner leniency and hopes of garnering leniency because he knows he has already confessed to it. And now all of a sudden he's being put in a room with a camera. So it's like, it's the big time now. So he'll find it. I'm sorry. Is there any speculation to that? How do you know that that's just from, uh, viewing the, it's a reasonable inference from viewing the, the record and the video, but that's what he appears to be doing because he continues to speak about it, about this ASA, like counsel said throughout the majority of his, um, uh, state, uh, statements to the police. He keeps wanting to talk to the ASA. When he mentioned the lawyer at that time frame, he wasn't talking about the defense counsel. He was talking about the state's attorney. That I, I mean, that again is up to the, what the officer believed if it was reasonable for the officer to believe that, um, I it's, that's my concern. Could he, could he have been talking about a defense counsel at that time? How do we know? Well, that's an excellent point. Your honor. We it's unequivocal. It's equivocal. We don't know. He doesn't just say I want a lawyer. Then we would know. But doesn't police officer follow up with something about the state's attorney though? Yes. Yes. It doesn't say anything about, but it doesn't say anything about the defense counsel, but it doesn't mention defense counsel because defendant says, I want a guarantee. And the police officer says, I can't give you a guarantee. So that's, that's what we're working with. Again. Okay. Here's where clarification would have helped. Would it not? Couldn't a reasonable officer said, do you want a lawyer? Is that what you're asking for? Um, I'm not, I mean, that's not the law. The police are not required to, um, ask. And I understand that I'm looking at what's reasonable. What is reasonable here? What's reasonable is based on the words used by the defendant. Was it reasonable for the police officer to, to think it was equivocal or unequivocal. And in this case, my, it's my argument that it was reasonable for the police officer to believe it was equivocal. Like I said, there's nothing stopping him from just asking for counsel and he didn't. Thank you. That's all. Thank you. Justice. Counsel. Um, let's, we'll start with harmless error. Uh, you just argued that the statement, even if we say that the earlier statement wasn't invocation of counsel, and we said there was no reinitiation that the first statement he made that was not videotaped would come in is your argument today, but I don't recall seeing that argument in your brief as part of your harmless error analysis, is it? And if so, can you give me a page? Um, I'm sorry, your honors. I, as you know, did not write the brief. That's all right. We can check, but it's your argument now that some statements, even if there was an early invocation and even if there was no reinitiation, some of the statements not on the videotape would come in and that needs to be part of the harmless error analysis. Is that your position today? Okay. And it's all right. I apologize. No, you don't need to look. We'll, we'll have, we'll all have time to look later. You are also free to send us a letter in the next few days and tell us what you missed. Um, then on this reinitiation issue, um, assuming, excepting for the moment, your argument that him saying, I can't go to jail because they're going to kill me is an initiation. Doesn't there need to be a cessation of questioning before there can be an initiation? Don't they have to stop questioning once you've invoked your right to counsel? And when, where did that occur here? Well, the detective left the room. So coming and going through the whole time they were coming and going, that was no big thing. They were coming and going throughout. It's not like they were there, they're there. He invoked and then they left. They came, they left, they brought food. They left them alone to stew. They came back. I mean, it went on for days. So they didn't say, Oh, you've asked for a lawyer. We're leaving. They wandered in and out. Correct. Was there anything that they did that affirmatively said to him, Oh, you've invoked your right to counsel. We're going to stop questioning you in any way. Well, I mean, they continued questioning him. I mean, it started out, he made a statement. Is there any way we can get a PD to come in? And then the detective changed the topic to like, I think it was food and then smoking and then talked again about the incident. So they continued to question him after what everyone agrees at this point was a clear invocation of his right to counsel, correct? Yes. And my question to you is, once that happens, can there be a re-initiation by the defendant? If they never stopped questioning, what is the defendant initiating? Well, they continued to question him, but then they did back into the room because the defendant knocked on the door, which is saying that he wanted to continue to talk because he had questions. So he knocks on the door, they come back and he says what he says about. And my question to you is, does it matter that before that they kept questioning him and never honored his right, his invocation of his right to counsel? Does that line up? Well, I mean, it matters that the court suppressed all of that. So it matters in that they didn't stop speaking and the court suppressed it. But when you look at when his next statement is so much time had been passed and he had been given his Miranda rights two more times, I think maybe three more times until he spoke to ASA Brazel. So we have the re-initiation and there's no more conversations about what had happened, just about smoking. And he has them keep coming into the room. And then it wasn't until 3.28 in the morning that ASA Brazel comes in, reads him his rights, and he makes a statement. And I might add too, when ASA Brazel comes in, the defendant just starts talking. He's like, I never meant to hurt anybody. And ASA Brazel's like, you know, whoa, whoa, whoa, I have to read you your Miranda rights. So it indicated that even if he was invoking back at, now I have to look at the time, 10.46, that by the time he talks to ASA Brazel, he has now waived his Miranda rights again and has shown repeatedly that he's willing to talk. So it's our position that that statement would come in, the statement to ASA Brazel, just because enough time had passed and he was given his rights repeatedly. Okay. Thank you. A brief rebuttal. Thank you, Your Honor. I'll just start with the he had invoked his right to counsel twice and been ignored, knocking on the door and asking for basic things like a cigarette, asking to speak to his girl. And counsel is correct that he did say he was afraid of being killed in jail. But again, that's still not an invitation to talk generally about the case and to be continually questioned. In any event, he wasn't re-Mirandized at that point. So that's not a re-initiation. The other two, again, are knocking on the door, asking for garbage can and asking for a cigarette. That's not an invitation for continuing interrogation. So the correct way for this court to view this is the interrogation never stopped. Again, these are experienced detectives and contrary to what the state's attorney argues, the 50 hours that he was being treated as a so-called third-party witness, that's still 50 hours in a room with detectives about a police murder. And they're wanting to get a deal after you know you're sunk and wanting to exercise your right to counsel. Those are not mutually exclusive. Justice Harris, you're hypothetical. Get me a lawyer. I need a guarantee. That is absolutely an unequivocal request for counsel. And that is what we have here as well. Mr. Colon is a gang member. He's a criminal. I'm starting to say, fuck it. Give me a lawyer because that's affirmative. That's how he talks. And the court does have to consider the detective, but this is an objective test. Objectively, could this reasonably be construed as an affirmative request for counsel? Absolutely. And looking at all the circumstances before that request is just more evidence to show that it was an unequivocal request for counsel. So when we get to his statement to ASA Brazil, again, the interrogation had never stopped at that point. He had never reinitiated. He was asleep in his cell from 109 a.m. all the way till 328 a.m. I encourage the court to watch that. He's just on the floor on the bench crying. Then the detective and Brazil come in, and that's when he makes the official statement. But by that point, he has already admitted to Detective Perez that he was the driver. So he already knows he's sunk at that point. ASA Brazil was just coming in to clean up the mess at that point. It doesn't mean that he reinitiated, and because Brazil read in his rights there that the statement is somehow admissible to be used against him. And I took detailed notes of the ERI, and I'm just, I looked back at the time in between, this is 2155 on January 12th. So this is after he's invoked for the second time. There is a lot of Detective Perez and Hillman affirmatively telling Mr. Colon, this is what you did, where did you drive, and was giving him affirmative things to say. But Mr. Colon never says, yes, I did that. So my position is still that between his first invocation at 959, where he says, I'm starting to say, just fuck it, get me a lawyer cuz. And then that time in between 1146, when the state agrees, he invoked his right. During that time frame, there is a lot of interaction with the detectives, and that's because the interrogation never stopped. And it's because the detectives were trying to get Mr. Colon to say on the tape that he was the driver by saying lots of things that your honors can see on the tape. But he never then affirmatively says, I was the driver until after he's invoked the second time. All right, your time is up. The time I'm specifically going to ask you to take a look at is 10.03 p.m. And again, send us a letter once you've had a chance to do that, and just make sure you send a copy to console. All right. Thank you both for a really excellent argument. This is a very interesting and complicated case, and you both did an excellent job in the briefs as well as an argument. So thank you very much. We will take this matter under advisement and you will hear from us shortly.